**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julie Henderson,<br><br>        Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>        Defendant. | No. CV-17-04488-PHX-DWL<br><br>**ORDER** |

**INTRODUCTION**

Plaintiff Julie Ann Henderson ("Henderson") seeks review under 42 U.S.C. § 405(g) of the final decision of the Acting Commissioner of Social Security ("Commissioner"), which denied her application for disability benefits and supplemental security income. For the following reasons, the Court finds that the administrative law judge's ("ALJ") decision was based on reversible legal error and remands for further proceedings.

Henderson is a 54-year-old female who previously worked as a deli clerk, baker, and bus driver, and alleges she became disabled in June 2012. In September 2012, she filed an application for disability benefits. (A.R. 297-298.) The claim was denied initially on December 20, 2012 (A.R. 94) and again upon reconsideration on September 26, 2013 (A.R. 116). Henderson then filed a written request for hearing on October 16, 2013. (A.R. 198-199). On August 12, 2014, she appeared and testified at a hearing at which an impartial vocational expert also appeared and testified. (A.R. 74-93.) On September 29, 2014, the ALJ issued a decision that Henderson was not disabled within the meaning of the

Social Security Act. (A.R. 161-173.) On April 18, 2016, the Appeals Council granted Henderson's request for review and remanded the case to the ALJ. (A.R. 181-182.) The ALJ conducted a new hearing on December 6, 2016 (A.R. 44-72) and issued a decision again determining that Henderson wasn't disabled (A.R. 21-35). Henderson requested review of the ALJ's decision, but the Appeals Council denied review on October 5, 2017. (A.R. 1-5.) At that point, the ALJ's decision became the Commissioner's final decision.

## LEGAL STANDARD

The Court addresses only the issues raised by the claimant in the appeal from the ALJ's decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001), *as amended on reh'g* (Aug. 9, 2001). The Court should uphold the ALJ's decision "unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* Put another way, "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The Court should uphold the ALJ's decision "[w]here evidence is susceptible to more than one rational interpretation," but the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (citations and internal quotation marks omitted).

"[H]armless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." *Id.* (citations and internal quotation marks omitted). The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." *Id.* Importantly, however, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Id.* at 1121.

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the

burden of proof on the first four steps, and the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, which addresses whether the claimant can perform any other work based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled.

**BACKGROUND**

At step one, the ALJ determined that Henderson met the insured status requirements of the Social Security Act through December 31, 2017 and had not engaged in substantial gainful activity since June 25, 2012. (A.R. 23.) At step two, the ALJ found that Henderson had the following severe impairments: degenerative changes of the spine; morbid obesity; unspecified myalgia/myositis; carpal tunnel syndrome; degenerative changes of the knees, left hip, and right ankle; asthma; depression; anxiety; and headaches. (A.R. 24.) The ALJ acknowledged that the record contained evidence of pulmonary embolism, chronic chest pain, transient ischemic attack, cardiac arrhythmia, primary snoring, onychomycosis, neck spasms, diabetes, restless leg syndrome, chronic sinusitis, bacterial vaginosis, hypertension, hematuria, noncardiac syncopal episodes, gastroesophageal reflux disease,

plantar fasciitis, vertigo, and possible broken toes bilaterally, but found that these were not severe impairments. (A.R. 24-25.) The ALJ further noted that Henderson alleged she suffered from myocardial infarction, Crohn's disease, and fibromyalgia, but concluded those ailments weren't medically determinable impairments. (A.R. 25.) At step three, the ALJ determined that Henderson didn't have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (A.R. 25-26.) At step four, the ALJ determined that Henderson had the RFC to perform light work, but with several exceptions. (A.R. 27-33.)[1] The ALJ found Henderson wasn't capable of performing her past relevant work, but could perform the occupations of mail clerk, routing clerk, and office helper. (A.R. 33-35.)

In her opening brief, Henderson argues the ALJ erred by: (1) failing to discuss the treating physician opinion of Dr. Michael Musci; (2) improperly rejecting Henderson's pain and symptom testimony; and (3) identifying jobs that exceeded Henderson's RFC at step 5. (Doc. 14.) Henderson further argues that the matter should be remanded for a computation of benefits. (*Id.*)

As explained below, although the Court disagrees with Henderson's first and third assignments of error—the ALJ's failure to address Dr. Musci's opinion was harmless and at least one of the jobs identified during step five was consistent with Henderson's limitations—the Court agrees the ALJ committed reversible legal error when discounting Henderson's pain and symptom testimony. The Court will remand for further proceedings, as opposed to remanding for an award of benefits, because further proceedings would serve a useful purpose and the record creates serious doubt as to whether Henderson is, in fact, disabled.

---

[1] These exceptions are that Henderson: (1) "requires a sit/stand option where she could sit, stand or walk a total of eight hours in an eight-hour workday exclusive of normal breaks but could change position every 30 minutes"; (2) "could occasionally climb ramps and stairs but never ladders, ropes or scaffolds"; (3) "can occasionally stoop, kneel and crouch but never crawl"; (4) "is limited to frequent handling and fingering bilaterally"; (5) "should avoid concentrated exposure to loud noises and fumes, odors, dust and gases and even moderate exposure to unprotected heights and moving/dangerous machinery"; (6) "is able to understand, remember and carry out simple instructions and tasks"; (7) and "should not work in a setting that includes constant/regular contact with the general public or more than infrequent handling of customer complaints." (A.R. 27.)

## ANALYSIS

I. <u>Dr. Musci's Treatment Notes</u>

Henderson argues the ALJ committed reversible error by failing to address Dr. Michael Musci's treatment notes, which she contends constitute a medical opinion. (Doc. 14 at 9-10.)

The Commissioner doesn't expressly argue that Dr. Musci's treatment notes don't qualify as a medical opinion. Instead, she argues that Dr. Musci's treatment notes "appear[] to be merely a recitation of Henderson's allegations, which the ALJ found not credible" and therefore the ALJ didn't need to address the notes because they weren't "significant" to his determination. (Doc. 18 at 4.) Additionally, the Commissioner argues that any error in failing to address Dr. Musci's treatment notes was harmless because the ALJ identified substantial evidence in his opinion that supports his reasoning. (*Id.* at 5.)

An ALJ is required to consider all medical opinion evidence. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Thus, if Dr. Musci's treatment notes constitute a "medical opinion," the ALJ committed error by failing to consider them. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) ("We hold that the ALJ erred because he neither explicitly rejected the opinion of Dr. Brown, nor set forth specific, legitimate reasons for crediting Dr. Walter over Dr. Brown.").

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). The regulation doesn't specify the form a medical opinion must take, and courts have concluded that a treatment note can constitute a medical opinion if it includes the type of information described in 20 C.F.R. § 404.1527(a)(1). *Winschel v. Comm'r*, 631 F.3d 1176, 1179 (11th Cir. 2011) ("The Commissioner argues that the ALJ was not required to consider the treating physician's treatment notes because they did not constitute a 'medical opinion,' but this argument

ignores the language of the regulations."); *Linehan v. Berryhill*, 320 F. Supp. 3d 304, 305 (D. Mass. 2018) (finding treatment notes to be a medical opinion where notes included a diagnosis and statements "reflect[ed] her professional judgment"); *Wider v. Colvin*, 245 F. Supp. 3d 381, 391 (E.D.N.Y. 2017) ("Dr. Waldemar's notes explicitly include diagnoses and, arguably, statements reflecting judgments about the nature and severity of the Plaintiff's impairment. Therefore, the Court finds that Dr. Waldemar's notes were medical opinions under the definition of the Act. . . ."); *Matthews v. Colvin*, 2016 WL 2342862, *2 (D. Ariz. 2016) ("Dr. Jeppson's treatment notes reflect his judgment about the nature and severity of Matthews's impairments, her diagnosis and prognosis, and what she could still do despite those impairments. Therefore, the notes constitute a medical opinion.").

Applying these standards, the Court concludes that Dr. Musci's treatment notes contain medical opinions (and, thus, the ALJ should have considered them). First, Dr. Musci is an acceptable medical source because he is a licensed medical physician. *Wider*, 245 F. Supp. 3d at 389 (citation omitted). Second, Dr. Musci's treatment notes include several statements that reflect judgments about the nature and severity of Henderson's impairments. For example, the notes include diagnoses and prognoses. (*See* A.R. 1046 ["[G]iven her history, she obviously does have a hypercoagulable condition and needs lifelong anticoagulation."].) They also include Dr. Musci's opinions on limitations resulting from diagnoses. (*See* A.R. 1036 ["[Henderson] is considering elective surgery [for carpal tunnel] but I would caution her from being off anticoagulation for a long period of time. [Henderson] was told she would have to be off for 2 weeks and I think this is excessive. . . . It is probably best she avoid unnecessary elective procedures if possible."].) Further, the treatment notes contain other medical judgments regarding the effects of Henderson's ailments. (*See* A.R. 1044 ["She has intact neurovascular status but is still using a wheelchair for ambulation, which is quite remarkable given her age and we would expect better recovery."]; A.R. 1041 [explaining that Henderson's decision "to hold off on [knee] surgery . . . is a reasonable decision given the timing of the previous thrombotic event was less then [sic] one year ago and was life-threatening."].)

However, it is important to note that not every statement contained in Dr. Musci's treatment notes rises to the level of a medical opinion. For example, Henderson places heavy emphasis on the fact that the notes contain summaries of Henderson's self-reported symptoms. (Doc. 14 at 10, citing A.R. 1041.) Such summaries, however, are not medical opinions reflecting Dr. Musci's judgment concerning Henderson's impairments. Indeed, Dr. Musci is a hematologist who examined Henderson for deep vein thrombosis and pulmonary embolism, and he noted the "nature of [Henderson's] disability is from an orthopedic issue." (A.R. 1041.) There's no evidence in any of the treatment notes that Dr. Musci conducted a physical examination of Henderson's knees. And it seems unlikely that Dr. Musci—a hematologist—would examine Henderson's musculoskeletal systems and render an opinion on the extent of her disabilities, especially when Dr. Musci knew Henderson had an orthopedist. (*See* A.R. 1041 ["Although she is clear for surgery from our standpoint, the decision between her and her orthopedic surgeon was to hold off on surgery at this time."].) Thus, it's evident that some of the statements within Dr. Musci's notes are mere documentation of Henderson's reported symptoms, not medical opinions.

This distinction is critical in this case. Although the ALJ should have addressed the portions of Dr. Musci's treatment notes that contain medical opinions (*i.e.,* the portions dealing with Henderson's hematology-related conditions), Henderson isn't claiming she's entitled to benefits on account of her hematology-related conditions. Instead, her overarching complaint is that the ALJ improperly discounted her musculoskeletal and mental limitations. Thus, the ALJ's failure to consider Dr. Musci's medical opinions is harmless in the context of this case. *Brown-Hunter v. Colvin*, 806 F.3d 487, 49 (9th Cir. 2015) (an error is harmless where "it is inconsequential to the ultimate nondisability determination").

II. <u>Whether the ALJ Erred in Analyzing Henderson's Credibility</u>

Henderson argues the ALJ erred by rejecting her symptom and pain testimony. (Doc. 14 at 11-15.) Specifically, Henderson takes issue with the ALJ's findings that (1) Henderson's testimony about her limited daily activities "cannot be objectively verified"

and (2) Henderson's testimony about her pain isn't supported by her treatment history. (*Id.*)

The Commissioner argues the ALJ properly discounted Henderson's testimony because her allegations were inconsistent with objective medical evidence. (Doc. 18 at 6-9.) Henderson's failure to follow treatment recommendations, the Commissioner further argues, indicates her symptoms weren't truly disabling, or else "she would have followed her doctor's earlier recommendation[s] to improve her symptoms." (*Id.*)

A. **Legal Standard**

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (citations and internal quotation marks omitted). Here, the ALJ determined that Henderson satisfied this first step, at least regarding some of her symptoms. (A.R. 28 ["[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . ."].)

If the first step is satisfied, and "there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (citations and internal quotation marks omitted). Here, the ALJ didn't find evidence of malingering, so he was required to provide specific, clear and convincing reasons to reject Henderson's testimony.

"A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter*, 806 F.3d at 493 (citation and quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted); *see also Holohan v. Massanari*, 246 F.3d 1195,

1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."). "[P]roviding a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter*, 806 F.3d at 494. Additionally, the ALJ must "elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell*, 775 F.3d at 1138.

B. **Henderson's Testimony**

Henderson testified that she suffers from numerous symptoms that limit her RFC. She testified that she needs to use a wheelchair "on and off." (A.R. 51.) She explained that she "can't stand for very long" and falls if she tries walking without a wheelchair or walker. (A.R. 54.) Further, Henderson testified that she can sit comfortably only for "about 15 to 20 minutes" and then she needs to "straighten [her] legs out" or "lay completely flat because of [her] back." (A.R. 55.)

Henderson also testified that she can lift "nothing," and "can't even hold a glass of water for more than a minute." (*Id.*) She explained that she can't write for longer than a few minutes because her hand starts to cramp. (A.R. 61-62.) Henderson further testified that she needs assistance to use the shower and restroom. (A.R. 54.)

Henderson represented that she has trouble breathing each day, which is caused by just getting out of bed. (A.R. 59.) She also claimed to suffer from daily chest pains, which prevent her from lifting her arms. (A.R. 60.) Additionally, Henderson testified that she has migraines three to four times a week, each lasting approximately twenty-four hours. (A.R. 58.) The migraines cause her vision to blur and she sees double. (*Id.*)

Henderson testified that she's losing her memory. (A.R. 57.) She explained that she'll have a normal conversation, and when the conversation ends, she "won't remember what [she] was talking about or even what [she] said." (*Id.*) Finally, Henderson alleged numerous other physical and mental ailments in her Disability Report, Pain Questionnaire, and Function Report. (A.R. 27-28.)

The ALJ found that Henderson's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (A.R. 28.) In support of his conclusion, the ALJ explained that "it is difficult to attribute that degree of limitation to [Henderson's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence" and Henderson's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (*Id.*) Additionally, the ALJ called into question Henderson's testimony about the severity of her symptoms based on her treatment history. (A.R. 30.)

C. **Analysis**

As explained below, the Court concludes the ALJ committed reversible error by failing to provide specific, clear and convincing reasons for discounting Henderson's testimony.

1. Medical Evidence

The ALJ determined there was only "relatively weak medical evidence, including . . . diagnostic studies and physical exams" that supported Henderson's claimed limitations. (A.R. 28.)

Henderson argues this analysis was flawed because (1) "[t]he ALJ states that diagnostic studies do not support Ms. Henderson's degree of limitation," but the ALJ then cites "numerous exam findings and testing that document[] the cause of her severe pain"; (2) the ALJ omitted many of her more severe testing results; and (3) there were multiple examples where the ALJ cherry-picked evidence supporting his position, while ignoring evidence that cut against his determination. (Doc. 14 at 11-15.)

The Court agrees that the ALJ erred. Although the ALJ broadly discounted Henderson's symptom testimony, he failed to identify the specific symptom testimony he was discounting or explain why. An ALJ must "*specify* which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Brown-Hunter*, 806 F.3d at 489. It's not

- 10 -

enough to "simply recit[e] the medical evidence in support of [a claimant's] residual functional capacity determination." *Id.*

That is precisely what occurred here.[2] As in *Brown-Hunter*, the ALJ "simply stated h[is] non-credibility conclusion and then summarized the medical evidence supporting h[is] RFC determination." *Id.* at 494. The opinion contains more than a full page of medical evidence that supposedly undermines Henderson's testimony (A.R. 28-29), but no analysis as to which testimony is undermined or why. "[T]his is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to review the ALJ's decision meaningfully, so that [the Court] may ensure that the claimant's testimony was not arbitrarily discredited." *Id.*

The lack of specificity is particularly problematic here because the ALJ's opinion can be alternatively interpreted as rejecting Henderson's testimony because it was *contradicted* by the medical evidence and rejecting Henderson's testimony because it *couldn't be verified* by the medical evidence. Although the former is a permissible ground for rejecting a claimant's symptom testimony, the latter is not. *See, e.g., Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.").

Although it may be possible, by drawing reasonable inferences, to identify

---

[2] Unlike *Brown-Hunter*, where the ALJ only "summarized the medical evidence supporting h[is] RFC determination," *id.* at 494, the ALJ here provided additional reasons for rejecting Henderson's symptom testimony (inability to objectively verify Henderson's daily activities and lack of treatment history). Thus, the Court's reasoning in this section relates only to the adequacy of the ALJ's evaluation of the objective medical evidence.

inconsistencies between the medical evidence cited by the ALJ and specific testimony given by Henderson, that is not the role of the Court. "[T]he credibility determination is exclusively the ALJ's to make, and ours only to review." *Brown-Hunter*, 806 F.3d at 494. This Court is "constrained to *review* the reasons the *ALJ* asserts." *Id.* Thus, "inconsistencies identified independently by th[is] [C]ourt cannot provide the basis upon which [to] affirm the ALJ's decision." *Id.*

### 2. Daily Activities

The ALJ also rejected Henderson's testimony because Henderson's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (A.R. 28.) Henderson argues that "[o]bjective verification of daily activities is not a legitimate reason to reject a person's credibility." (Doc. 14 at 13.) The Commissioner responds that "[t]he ALJ weighed Henderson's allegations but found them inconsistent with the objective medical findings." (Doc. 18 at 6-9.)

The Court notes there is significant overlap between the ALJ's "daily activities" reason for discounting Henderson's testimony and the ALJ's "relatively weak medical evidence" reason. To the extent the ALJ considered objective medical evidence when determining that Henderson's daily activities couldn't be verified objectively, the Court will not address that evidence in this section because the Court considered it in the previous section.

First, the ALJ observed that the record contains "no evidence of atrophy or muscle wasting, which would be expected for an individual with [Henderson's] alleged level of inactivity." (A.R. 28.) However, the ALJ failed to cite any evidence in the record to support his conclusion that Henderson's relatively inactive lifestyle would cause atrophy. This was error. *Lapeirre-Gutt v. Astrue*, 382 Fed. App'x 662, 665 (9th Cir. 2010) ("[T]he ALJ noted that [the claimant's] lack of muscle atrophy was inconsistent with her allegations of inactivity. . . . However, no medical evidence suggests that high inactivity levels necessarily lead to muscle atrophy. . . .").

The ALJ also failed to identify which testimony he deemed incredible as a result of

- 12 -

the lack of atrophy. That was further error. *Holohan*, 246 F.3d at 1208 (an ALJ is required to "specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony"). Indeed, the presence or absence of atrophy is entirely unrelated to breathing trouble, chest pains, migraines, and memory loss (and, thus, couldn't provide a basis for the ALJ to discount Henderson's testimony concerning those impairments).

The ALJ also rejected Henderson's testimony that she required a wheelchair, explaining that Henderson didn't obtain a prescription for a wheelchair until October 2014, which is nearly two years after her alleged onset date. (A.R. 31.) Further, the ALJ observed that there is no documentation in Henderson's orthopedic records that she arrived at her appointments using any assistive devices. (*Id.*) The ALJ noted that, on eight separate occasions over nearly three years, each orthopedic record indicated that Henderson used "no assistive devices." (A.R. 31, citing A.R. 2229, 2234, 2239, 2244, 2249, 2254, 2259, 2264).) These reasons for rejecting Henderson's testimony concerning wheelchair use are specific, clear and convincing. If Henderson truly required a wheelchair to ambulate, one would expect her to have obtained a prescription closer to her alleged onset date, and her medical records would indicate that she arrived at her appointments using a wheelchair. Thus, the ALJ did not err in rejecting Henderson's symptom testimony that she required a wheelchair.

### 3. Treatment History

The ALJ determined that "overall, [Henderson's] allegations are not supported by her treatment history." (A.R. at 30.) The ALJ explained that "[d]espite being told by different medical personnel that losing weight would likely reduce symptoms, [Henderson] failed to do so." (*Id.*) The ALJ also pointed to Henderson's refusal to wear compression stockings after being advised to do so. (*Id.*) The ALJ also reasoned that Henderson's "sustained use of marijuana shows that she is able to consider, financially afford, and follow through with treatment modalities when she is inclined to do so." (*Id.*) Finally, the ALJ noted that Henderson has had only "minimal mental health treatment." (*Id.*)

- 13 -

The Court is skeptical that Henderson's use of medical marijuana constitutes a clear and convincing reason for discounting her testimony. Using marijuana for chronic pain is a significantly different type of treatment than those Henderson allegedly failed to follow.

Nor was Henderson's refusal to lose weight a convincing reason to reject her symptom testimony. Although "failure to follow prescribed treatment is generally a proper basis for an adverse credibility determination, the Ninth Circuit has held that an obese claimant's failure to follow her doctor's recommendation to lose weight, as opposed to her failure to follow 'prescribed treatment,' may not be used to support an adverse credibility determination." *Muldoon v. Colvin*, 2014 WL 449446, *3 (C.D. Cal. 2014) (citation omitted); *see also Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("[T]he failure to follow treatment for obesity tells us little or nothing about a claimant's credibility.").

The ALJ also discounted Henderson's credibility because she refused to wear compression stockings. However, the record reflects that Henderson refused to wear such stockings only on one occasion. Dr. Musci noted the compression stockings were "causing too much pain for [Henderson] to stand," and "we are trying to get her to wear a lighter compression stocking in the future." (A.R. 932.) The next treatment note from Dr. Musci stated that Henderson was "wearing a compression stocking in [sic] the left leg to help with [lower extremity edema]." (A.R. 934.) The ALJ didn't identify any other instances where Henderson refused to wear stockings. Therefore, Henderson's refusal to wear her stockings on one occasion, because they were causing her pain, wasn't a convincing reason to reject her symptom testimony.

Finally, the ALJ noted that "the medical record . . . reflects minimal mental health treatment." (A.R. 30.) The record contains only four medical records in which Henderson specifically sought treatment for her mental health. The four instances occurred during a short period, beginning in January 2016 and ending in May 2016. Minimal mental health treatment may well be a convincing reason for rejecting some of Henderson's symptom testimony. However, the ALJ didn't specifically identify the testimony he found incredible or explain why Henderson's failure to obtain additional mental health treatment was a

reason to disbelieve her testimony.

IV. Step Five Analysis

Henderson argues the ALJ erred by concluding she was capable of performing the jobs of "mail clerk" and "routing clerk" because those jobs require Level 3 reasoning, yet she is capable of performing only simple, repetitive tasks. (Doc. 14 at 10-11.) Henderson also argues the ALJ erred by concluding she could work as an "office helper." (*Id.*) In support of this argument, Henderson submitted a report from a vocational expert, which concluded the "amount of tasks . . . of an office helper are too varied to allow for a change of positions every thirty minutes." (*Id.*)

In response, the Commissioner concedes the job of mail clerk requires Level 3 reasoning and thus exceeds Henderson's mental capabilities. (Doc. 18 at 9-12.) The Commissioner argues, however, that the job of routing clerk requires only Level 2 reasoning. (*Id.*) The Commissioner also contends the Court shouldn't consider the report of the vocational expert, because it was submitted as new evidence, and argues that the ALJ's finding that Henderson could perform the job of office helper is supported by substantial evidence. (*Id.*)[3]

The Court agrees with the parties that the ALJ erred by concluding Henderson could perform the occupation of mail clerk. The ALJ found that Henderson "is able to understand, remember and carry out *simple* instructions and tasks." (A.R. 27) (emphasis added). But "mail clerk" requires an individual to be able to perform Level 3 reasoning, which means she can "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form." *Mail Clerk*, Dictionary of Occupational Titles ("DOT") No. 209.687-026, *available at* 1991 WL 671813. The Ninth Circuit has recognized that "it may be difficult for a person limited to simple, repetitive tasks to follow instructions in 'diagrammatic form' as such instructions can be abstract." *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) (citation omitted). Therefore, "there is an apparent conflict between the residual functional capacity to perform simple, repetitive

---
[3] Notably, Henderson did not attempt to address these arguments in her reply brief.

- 15 -

tasks, and the demands of Level 3 Reasoning." *Id.*

The ALJ did not err, however, by determining that Henderson could perform the occupation of routing clerk. Henderson's argument that this job requires Level 3 reasoning is inaccurate—it only requires Level 2 reasoning. *See Routing Clerk*, Dictionary of Occupational Titles ("DOT") No. 222.587-038, *available at* 1991 WL 672123.

Given this conclusion, the Court need not reach whether the ALJ erred by determining Henderson could perform the occupation of office helper. Any error concerning that issue, or the mail clerk issue, was harmless because routing clerk positions exist in "significant number" in the national economy. *Beltran v. Astrue*, 700 F.3d 386, 388-89 (9th Cir. 2012) (a claimant is not disabled under the Social Security Act if there are a "'significant number' of jobs in the regional and national economy that [the claimant] could do.") The vocational expert testified there are 95,000 routing clerk positions in the national economy (A.R. 66), which is enough to be considered significant under Ninth Circuit law. *See generally Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528-29 (9th Cir. 2014) (canvassing cases).

V. Scope of Remand

Henderson asks the Court to remand this case to the ALJ for a computation of benefits. If the Court credits as true Henderson's testimony and Dr. Musci's medical opinion, Henderson argues, she would be precluded from performing all work activity. (Doc. 14 at 15.)

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). This applies particularly "[i]f additional proceedings can remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (citation omitted). But there is an exception to this rule, known as the "credit-as-true" rule, under which the court may remand with instructions to calculate and award benefits. For this rule to apply, a three-part test must be satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide

> legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

Here, the credit-as-true rule arguably isn't satisfied because a remand would serve the useful purpose of allowing the ALJ to address Henderson's testimony with more specificity and, potentially, to consider Dr. Musci's treatment notes. Moreover, "even [if] all conditions of the credit-as-true rule are satisfied," it is unnecessary to remand for an award of benefits if "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, the Court has serious doubts whether Henderson is disabled. Henderson testified that she falls if she tries to walk without a wheelchair or a walker. But, as noted by the ALJ, there were many instances in the record where physicians observed Henderson without an assistive device. Henderson also testified that she has trouble breathing, which is brought on by simply getting out of bed. But evidence in the record shows that Henderson smokes medicinal marijuana, as opposed to ingesting by other methods, which indicates that Henderson may be exaggerating her symptoms regarding shortness of breath. Henderson also testified that she has migraines three to four times a week, each lasting approximately twenty-four hours. The record, however, contains sparse details about the debilitating migraines she claims to suffer. Additionally, a majority of the medical opinions considered in the ALJ's decision indicate that Henderson could perform at least sedentary work. (A.R. 31-33.) Therefore, the Court will not remand for a calculation of benefits.

Accordingly, **IT IS ORDERED** that the final decision of the Commissioner of Social Security is **vacated**, and this case is **remanded** for further proceedings consistent with this opinion. The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 8th day of March, 2019.

Dominic W. Lanza
United States District Judge